All right, Mr. Haynes and U.S. v. Robertson. Good morning, and may it please the Court. I'm also joined today by John Lucere, who is my co-counsel. We were appointed to represent Merrill Robertson on trial and now on this appeal. Mr. Robertson, as the Court is probably no doubt aware, was tried and convicted on 15 counts of fraud and money laundering related to his role with Cavalier Union, a Richmond-based investment firm that collapsed after the SEC began an investigation of its practices in 2015. What we're here for today is that because of two very unusual and shocking events that occurred during the course of those proceedings. The first of those is that at the end of the last day of evidence in the trial, after Mr. Robertson had completed his testimony in trial, the trial court announced in open court that it was revoking his bond because in the Court's view, Merrill Robertson was a liar and was guilty. Now, the trial court did not say this in front of the jury, but it did say it in front of the reporters who were covering this case. And the next day, the Richmond Times-Dispatch ran an article on the front page of the Metro section with the headline, Ex-UVA Football Players Bond Revoked in Fraud Trial. Judge Calls Former Chesterfield Resident, Quote, Not a Truthful Person. When Merrill Robertson, through his counsel, brought this matter to the judge's attention immediately, that we did the next morning. And under circuit law, what the judge was supposed to do is clear. What he was supposed to do is to ask collectively initially about the juror's knowledge of the article to determine if any of them could have been exposed to the judge's critical and prejudicial comments. The judge didn't do that here. Because this deprived Merrill of his right to fair trial by an impartial jury, this court should reverse for that reason alone. So you believe that our case in U.S. v. Jones has this language, inquiries should be made whether any jurors had read or heard the prejudicial publicity in question. Yes, Your Honor. Had he done that, it would have been all right. Yes, Your Honor. He would have had the right answer. Yes. If he had asked questions focusing the jury's attention on the article to determine whether there was potential exposure. And that was very important for a couple of reasons. You know, the jury could, frankly, just have seen the headline and not read the article. They could have very honestly answered a question. They didn't read an article. But exposure to the headline, exposure to the fact that the judge had made critical comments about the jurors, about Mr. Robertson's credibility, alone would have been so significantly prejudicial. Mr. Robertson's What about the judge's concern that the jury was not sequestered, might take longer than a day to complete deliberations, and that if he mentioned the specific Times-Dispatch article, all he would be doing would be creating curiosity and causing the jurors to immediately go and try to look that up, you know, that evening or at their first opportunity. Right. Well, I mean, Your Honor, I think, again, what's important here is that exposure could have been inadvertent here. And I think there's no reason that we have to distrust that the jury could have been conscientious and been told how to follow its instructions. As a matter of fact, I mean, part of the government's argument here is that we really don't have to look here at all because the jury was cautioned frequently not to read articles, not to pay attention to the media. So we can't have it both ways. We either can trust our juries or not trust our juries to follow a conscientious direction about what they're supposed to do. Aren't you asking us not to trust the jury since he did ask the question in a more general fashion and no one responded? Well, no, Your Honor, and the reason is this. I think the reason that the court, the cases, say you need to ask about the prejudicial publicity is you need to give the jurors enough information to know what it is that they are being asked about to identify any potential exposure. Compare what the judge did in this case to, for example, in U.S. v. Carter, where the judge asked in four different sentences, giving each person an opportunity to raise their hands after each question about newspaper articles, about the radio, about the television. The judge in that case conducted what the court said was a careful and thorough examination, 117 words long, four sentences, opportunities to raise your hands at each time. In this case, the judge called in the jury at the beginning of the last day, addressed the matters regarding jury instructions, told them that they'd be getting the case soon, and then asked a 17-word question that takes about six seconds to say, shorter than it took for me to walk from my desk here to the podium this morning. And again, did not mention... He basically asked him, have you read or heard anything about the case? During the trial. During the trial. That's right, Your Honor. Did he habitually ask that every morning? What he gave were instructions, I believe, and I can't say each morning and each afternoon during the trial, but frequently. When you go home, you do not read anything about the case, don't listen to any articles about the case, don't go on the Internet and look up the lawyers and those kinds of cautions. In your view, I just want to make sure I understand the timing, right? If the judge had said, this is the morning the article comes out, right? If the judge, instead of having asked a general question, had asked a more specific question, you would have been satisfied even though, I guess I have sort of a timing-related concern, which is then everyone goes home that night and the question never gets asked again. So isn't there a concern that somebody goes home that night and while following the judge's instruction, I'm not reading anything. They just pick up their local newspaper and there's the headline. True, Your Honor, but by bringing the juror's attention to the fact that there is information that you should not consider that ran in that morning's newspaper, that gives the jury some ability to control that. They know that they get the Richmond Times-Dispatch, the way many people do in the metro area, and they know what to avoid. You could have even said, just don't pick up the metro section of your local paper today. Just don't pick it up. There's a headline there. You shouldn't read it. You shouldn't read the article. But we don't have, the jury didn't have the chance to do that in this case. And, Your Honor, we identified four or five very short questions that we asked the judge and said that the judge should have asked by the jury that, again, would not have required the jurors to learn anything prejudicial about the case, just to have it drawn to their attention that this information is there and it's important for us to explore whether there was any potential exposure here. And that's what we believe is the court's mistake there. The second reason, Your Honor, the second what I call shocking event in this case, is the sentence itself, and I neglected to mention at the outset. Mr. Robertson was given a 40-year sentence as a 37-year-old first-time offender by the same judge after the jury had convicted Mr. Robertson. Mr. Robertson received a pre-sentence report with guideline calculation that the trial court upheld as the correct calculation of 235 to 293 months. Obviously, a very long sentence already within those guidelines for, as I say, a first-time nonviolent 37-year-old offender. Neither the government nor the pre-sentence investigating officer identified any factors that would call for an upward departure or variance. The government asked for a sentence at the top end of the guidelines, and the pre-sentence report, which is in the record, didn't identify factors that would support it additionally. Nonetheless, the trial court gave 40 years, which was more than 15 years, greater than the top end of the guideline. Because the trial judge did not consider, as we point out under Gaul, the extent of the variance and did not provide any rationale for the particular sentence chosen, the sentence was procedurally and substantively unreasonable. So as I understand your argument here, it's that it's not enough for the district court to have explained, look, here's how I got to 40 years, sort of in quotes. This is a very high sentence, and here's how I got there. There also needs to be some separate discussion of the extent of the variance. It's not just that it's a 40-year sentence. It's that it's a sentence 15 years above the high end of the guidelines, and that part of it is not addressed. That's our procedural argument. Yes. And the best authority for that is Gaul itself? Is that your argument? Yes, Your Honor. It's just the plain language of Gaul and the logic and structure of Gaul. I mean, what Gaul says in this context, and Gaul says a lot of things, but the aspects of Gaul that apply to a court's determination to impose an above-guideline sentence is threefold. The guidelines are the initial benchmark. Second, that if you're going outside, that you must consider the extent and degree of the variance. And the third, connected to that, is that a major departure must be supported by a more significant justification than a minor one. So the logic and structure of Gaul, Your Honor, is what we believe requires that as a procedural step. Just as a matter of logic, you have to acknowledge what the guidelines point to as the initial benchmark. And then explain, with this extent of departure, why that is necessary, what purposes that that's accomplishing. Because, as we point out in our brief, many of the factors that the court cited at least are considered in the guidelines or are part of the guidelines' consideration or overlap with them. For example, the number of victims, which is one of the issues that the judge cited. So is part of that explanation, I really am trying to get my hands around the disposition and what it looks like. Is part of that explanation, because the explanation for the sentence in this case is exceedingly thorough. It runs to many, many pages. And so you have an explanation for 40 years. But I take your point. At no point does the court say, I get that this is 15 times over the guidelines' range, but I think that's appropriate and here's how come. And is what follows that made-up colon I just put in there, is that supposed to be a discussion of what it is about the guidelines themselves that fails to capture what happened in this case? Or can it just be more of the same kind of thing? Like, I get that this is 15 years over the guidelines, but I just think this is a really bad crime. Your Honor, what it has to be, if I may, and Gall, again, is trying to avoid mathematical, Gall and the post-Gall regime is trying to avoid mathematical, rigid mathematical formulas, which we acknowledge. The point is that what the court has to do by doing that is explain why the particular sentence chosen is one that is supported by the court's rationale. And so it's not just to vary, and it's not just to vary by 15 years, but how is this particular sentence chosen? And that's what's lacking when you don't go through that process, and frankly is lacking in what the court's ultimate rationale for imposing a 40-year sentence was. What the court said was, after citing multiple factors that were leading him to vary upward, he then mentioned and cited in his statement of reasons that 40 years was necessary to provide for deterrence and protection of victims, essentially. But again, Your Honor, that can just as easily be said of a 20-year sentence, a 40-year sentence, or a 50-year sentence, without some context tying the amount of that sentence to a rationale connected with 3553A factors that the judge was citing. There's no way for the appellate court, which is your obligation, to conduct a meaningful appellate review, and there's nothing to promote the perception of fair sentencing that occurs here. So do you think the judge should have tied it to some guideline range and gone through some analysis that says, you know, I find a sentence is sufficient but not greater than necessary, can't be achieved at this guideline, so I'm varying up and then give pretty much the same reasons today? Or is there some – I'm trying to figure out if it's more of a mechanical objection or if there's something specific that the judge needed to say that he did not say in order to justify the length of the sentence. Because I'm sort of like Judge Harris. It is a comprehensive discussion of the reasons for the sentence, right? Right. Your Honor, this is what I would say is the answer for clarity. That should be the message that should be given about this sentence. And that is what the court needed to do is to explain, I am imposing a 40-year sentence, and that sentence is greater – is sufficient but not greater than necessary. And consider – and I've rejected lesser theories that can't – lesser sentences because they wouldn't satisfy those requirements. But if we agree with you on the publicity issue, we don't need to reach the sentencing issue, do we? Your Honor, actually, it's a good question. If the court remanded and granted a new trial, then yes. Obviously, sentencing would only come if Mr. Robertson were retried. There is a procedure that we noted that the Tenth Circuit did in the Thompson case, where the initial opinion, they said, you've got to go back and retry. And then in a subsequent opinion, I think after a motion for rehearing had been filed, they said the court can reconvene the jury in this case and attempt to ask questions to determine whether there was any potential exposure to what happened during trial. And the Tenth Circuit said if the trial court can do that and satisfies itself, it's that memories were fresh enough and that they could – essentially that the judge might be able to salvage the jury or salvage the verdict. So my only hesitation is if this were remanded without the sentencing issue also being addressed, it potentially could have to come back. But if you grant a new trial to Mr. Robertson, which we do believe is the right outcome here, then no, you would not have to confront this issue. Anything else? Your Honor, I've reserved some time for rebuttal unless you have any other questions. Thank you. Thank you. Ms. Martin. May it please the Court. Merrill Robertson's trial was fair. His convictions for defrauding investors and financial institutions were supported by overwhelming evidence, and his sentence was both procedurally and substantively reasonable. Mr. Robertson is not entitled to a new trial because the court determined that no juror was exposed to any prejudicial publicity. Now, Mr. Haynes indicated that the court conducted a bond revocation hearing at the close of evidence in the case outside the presence of the jury. The court heard from both parties before deciding that it was going to revoke the defendant's bond and then set forth on the record its reasons in support of its finding that the defendant posed a risk of flight, including not just that Mr. Robertson, the court found Mr. Robertson untruthful during his testimony on both direct and cross-examination, but also that Mr. Robertson, during the course of his testimony, acknowledged that he had diminishing familial ties. He had been kicked out of his home. He was having trouble in his marriage. He, among other things, the court noted that it was clear to the court, based on the evidence, that Mr. Robertson had shown a willingness to exploit those closest to him. So the court set forth all those reasons for its finding that Mr. Robertson posed a risk of flight. It just so happened that there was a Richmond Times dispatch reporter in the courtroom when the court conducted the bond revocation hearing. And so some of the court's comments made in support of its finding were reported the following morning in the paper. Well, you know, most trial judges don't tell you or don't watch television, don't read the newspaper. And so what happens is they just pick up the paper and they inadvertently see that article. That can happen. And so in this case, would you agree that what the judge said would have an impact on jurors? Certainly if a juror was exposed to the trial judge's comments, it would prejudice the defendant. The government does not argue otherwise. And, in fact, neither did the trial judge. The morning that the article was published, the first thing defense counsel did was move for a mistrial. And the court, in acknowledging that motion for a mistrial, said, in fact, if a juror has been exposed to these comments, that may be grounds for a mistrial, but I am going to follow the process laid out by the Fourth Circuit in a line of cases, including United States v. Jones. And the court set forth on the record, before the jury entered the courtroom that morning, the process that it intended to follow. That is, it would first collectively inquire of the jury generally, whether they had heard or read anything about the case. And then the court noted that if any juror indicated that it had heard or read something about the case, the court intended to question that individual on their own, outside the presence of other jurors in greater detail to determine the extent of the exposure. How do you square the general question that the trial court asked in this case with the language in Jones that we were talking about a while ago that indicates that the court should inquire about the publicity? Is it the government's position that a general question of the type the court asked here is sufficient to meet that directly with Jones? I think that the court's general question here is sufficient. So courts that have addressed this issue of prejudicial publicity have, I think, uniformly acknowledged that each case is unique and that a trial court needs to have the flexibility to determine the substance and extent of its questioning of jurors based on a whole host of factors. And so here, the court did carefully craft its question to strike a balance between determining whether any exposure occurred. And as the court noted, its reason for the way it crafted its question, it also was balancing that against potentially aggravating any exposure that already had occurred or inciting additional problems. And so here, the court starts with a general, broad question and then indicates that if there's an affirmative response to that general, broad question, it will certainly then inquire in detail of an individual outside the presence of other juries. The court can also be concerned that asking a more specific question right out of the gate to the jury collectively could elicit a response from a juror in front of the entire panel, right, that it would rather maybe or hope to contain in an individual question. And so here, the court struck a careful balance. And indeed, there's no evidence that the court's inquiry was confusing. In fact, I think, as Mr. Haynes acknowledged, the court at the outset of the trial, in its initial instructions to the jury after they were in panel but before any evidence was entered in the case, issued lengthy instructions, and at several points during those instructions, the court admonished the jury not to read any articles, not to look on the Internet. This is my concern. Those all seem like wonderful instructions in the abstract, but I could be a juror in this case and feel that I was absolutely living up to the instructions. I'm not going to read any articles about the case, but if I picked up my local paper and put my eyes on it, I'm going to see this pop-out headline that says, wow, my trial judge called that guy a liar. And I can do that without ever reading an article. And I'm very concerned that a juror in this case could think, absolutely, I'm abiding by my instructions. And I'm even answering the question, right, because it says, did you read anything about the case? No, I didn't read the article. The judge told me not to read it. I mean, I saw the headline, but I didn't read the article. That's my concern. And I also have a concern about the timing, which maybe you can address. Even if we think this question was adequate on this morning, the jury goes home that night. And at least in my household, that's when we read the newspaper. And then what about the next morning when they come in and deliver their verdict? I don't think the judge asked the question again. So starting with the first question and going to the second, I think the first point the court makes is, you know, could it be a confusing question? You know, does it really get to whether a juror read the headline but didn't read the article? I'm not talking about, like, magic words or anything. I'm really trying to put myself in the shoes of a juror. The district court doesn't say, don't pick up your local newspaper. It just says, don't read the wrong article. So I'm absolutely fulfilling those instructions, and all I did was see the headline, and I didn't go any further. Well, I do think that the court's initial instructions before any evidence was taken in the case are more detailed. That is, they were, you know, not reading anything, not looking on the Internet, not talking to anybody about it, not listening. Under the original instructions, a juror would not have been able to pick up the metro section of that newspaper. It was clear, like, don't even go near the newspaper. I think the entire, in the entire context of the trial, the amount of times, first in the initial instructions and then the court repeated those instructions throughout the course of the trial, every single day of the trial. And indeed, in its initial instructions to the jury, the court indicated that its instructions pertaining to not reading or listening to anything about the case were also posted on the wall of the jury room. But this genuine question, I've never been actually allowed to serve on a jury. But so as a juror, when I have understood that to mean I should stay away from the newspaper. I think when you look at all of the court's instructions about, first of all, even the initial of what year questions, right, to get at who had been exposed to pretrial publicity, the court was saying, listen, just don't look at anything. Not just don't read, don't look at anything about the case. Right. I would not have understood that to mean do not pick up your local newspaper. I would have understood it to mean when you see something about the case, avert your eyes. I think when you have kind of this liturgy of don't read anything about the case, don't talk to anybody about the case, don't look on the Internet about the case, don't research anything about the case. And, in fact, that jurors understand that to mean I should not use the Internet for the duration of the trial? I think that jurors take that to mean, you know, don't expose, yeah, don't look up anything about the case. And I'm not looking in my newspaper for articles about the case. I'm just reading the newspaper. No one told me I couldn't do that. I just, I mean, maybe your argument doesn't rest on this. I mean, I don't think it does because I think ultimately what happens is the court, and, again, I do think your point about timing is important. At the close of evidence, the last thing the court says to the jury before they leave that night is, don't read anything about the case. It repeats the admonition that it has repeated throughout the trial. Don't read anything about the case. Don't look up anything about the case. The jury leaves. The very next thing the judge says to that jury the next morning is, have you read or heard anything about the case? And so that's not, there's no confusion there, right, because the admonition has been repeated so many times, and then the very next thing the court says is, have you read or heard anything about the case? No juror indicates that they have. And, of course, a court's determination that an estimation of a jury's demeanor and their candor in response to that question has to be afforded great deference because. This is my concern that the jury, an absolute juror, my hypothetical juror, me, in absolutely good faith is saying, of course I didn't read anything about the case. You told me a thousand times not to. I would never do that. But they saw the headline. But in all good faith they believe they have been fully compliant with these instructions throughout. So tell me, what do you think Jones, United States v. Jones, and the language that was explicitly in the opinions, what do we do with that? What does it mean now, based on your argument? I think based on our argument that is that, you know, it would be impossible for this court to craft an explicit question that every trial court would use, would ask, to ascertain whether a jury had been exposed to prejudicial publicity, given all the possible scenarios that a court could be presented with, right? There are certainly scenarios where a court might not want to mention the publication at all, right? But the publication itself that published the prejudicial article could be, the court could fear that that would be prejudicial in some way. So I think what Jones does, and again these line of cases say, is that you must give the trial judge flexibility and discretion to determine the extent of its questioning, appreciating again that a trial court is in the best position to ascertain whether a jury is being candid in their response, whether they're in fact confused, right? The trial court is the one sitting and looking at these jurors and looking at their facial expressions and their demeanor when he's asking the question. And so the trial judge is in the best position to determine whether there's a look of confusion, whether they're perplexed by the question or not. I think, Judge, I want to get, Harris, I want to get back to your question about, you know, was there an instance when the trial court went back and asked the question again? Because at that point the evidence was closed in the case and the jury was about, in fact, the parties had not yet made their closing statements. And the court, I think importantly, had not yet instructed the jury. And so the court asked its questions, its question determined that no juror had been exposed to prejudicial publicity. And then there was an opportunity for the court to again instruct the jury in its fulsome closing instructions about the basis for its decisions, the basis for its verdict. And I do believe there were in those closing instructions were, again, repeated admonitions about not basing their verdict on anything outside of the courtroom and the evidence presented in the case. I take your point about the variety of circumstances a district court might have to consider and how hard it would be to come up with kind of a blanket rule. But I wonder whether, I mean, what strikes me about this case is just it's this odd combination, very troubling combination of the extent of the prejudice that would follow from something like this. I mean, a lot of these cases are about things way less prejudicial than this. And then the plausibility, it's the local newspaper. If people still get it delivered to their house, sitting right in their house, it's entirely plausible that some of the jurors would have access to this newspaper. And then the fact that it's, you know, in a headline so that even if you are, you can imagine at least a juror who thinks, understands these instructions. I mean, don't read the article, but I'm allowed to look to see what else is going on in my neighborhood, so I'm allowed to pick up the metro section. That when you put all of that together, like we're not issuing a bright line rule or anything, but put all of that together and it's troubling enough that it required something more than this. Again, I think it's another important thing to note is that there was no evidence here either beforehand or after that any juror was in fact exposed, right? So in other cases that have considered pretrial or prejudicial publicity, there's been some evidence either because a copy of the paper was found in the jury room or jurors were actually observed reading the exact publication during the course of the trial. This is the main local paper in town, right? It is. I'm sure I'm dating myself terribly, but isn't it sort of, it's not like it's the LA Times. It's plausible that someone on this jury who lives in this town subscribes to the local newspaper. It is plausible that somebody on the juror subscribed to the local paper, but again, the court's question, I think where we disagree, Judge Harris, is that a question about reading, whether they read or heard anything about the case, would encompass the concern that you have about them reading a headline, right? So in I think the government's view, that question, read or hear anything outside the courtroom about the case, would encompass, I mean, even if it's just a glance, you're still reading the headline. And so it would have been encompassed in the court's question, and the court's question was carefully crafted to get it at that, whether anybody had been exposed, but also not aggravate any potential problem that it already had. And so I think as the court described it, it was in the horns of a dilemma, and it struck the right balance here. I'd also like to quickly address defense counsel's argument about the reasonableness of the court's sentence, unless the court has other questions about the handling of this. Mr. Robertson's sentence was both procedurally and substantively reasonable. The district court took great care in imposing this sentence and was meticulous in the way it followed in its imposition of sentence. It talked at length about the statutory sentencing factors in over an hour, in fact, it took to walk through every single sentencing factor, even though it was not required to. It took account of the correctly calculated advisory guideline range, but then explained that it was going to impose an upward variance and went on to explain the specific reasons for the extent of its variance. And so specifically, the court acknowledged that many of the reasons for its upward variance, it had already covered in its Section 3553A analysis, which it is permitted to do. The court's not prohibited from considering certain factors that are already accounted for under the guidelines to support a sentence outside the guidelines. And so the court pointed then specifically to Mr. Robertson's, among other things, Mr. Robertson's dishonesty. These were two separate large-scale fraud schemes committed over an extended period of eight years. The court went on to point at the horrible effect the crime had on Mr. Robertson's victims, noting that many of these victims themselves were going to be serving a life sentence as a result of Mr. Robertson's conduct. The court pointed to the need to protect the public from Mr. Robertson, who at every stage had shown himself to be undeterred. He was deposed by the SEC. He was approached by FBI agents. His home and his place of business was searched, and still Mr. Robertson was engaging in crimes that had a horrific impact on many of his victims. So I don't mean to put you on the spot, but the government originally thought the high end of the guidelines would be sufficient, and this sentence is 15 years above that. So because the high end of the guidelines is pretty high, right, 24 years? It was a little over 24 years, correct. So it would just help me in trying to do sort of the kind of review we have to do. What is it about the guidelines that got you so far off in this case? How is it that the guidelines are within two-thirds of the right sentence in this case? Is there something? Is this not a heartland case? Is there something about this case that the guidelines didn't anticipate? I think there were a number of things that the court specifically focused in on. Mr. Robertson's exploitation of those closest to him, both to commit his crimes and who were victims of his crimes. So, for example, Mr. Robertson used his stepson to create fabricated account statements to send to investors. He used his aunt to launder money from the fraudulent loans. He collected money from retirement accounts of his childhood Sunday school teacher, his high school basketball coach. So the court really focused in on Mr. Robertson's exploitation of those closest to him, and it also focused in on the callous nature of his crimes. The fact that, you know. 24 years. I mean, 24 years sort of, I think, probably incorporates the degree of callousness, right? Like if someone wasn't callous, they probably shouldn't be getting 24 years in the first place. Indeed it does, but I think the fact that this court might find a different sentence appropriate, it's insufficient to justify reversal of the trial court here. The trial court set forth significant justifications for its sentence. I know we have one more question. Sure. Sorry, because we talked to your colleague about this a little bit. So, I mean, I absolutely understand this, but you didn't hold an explanation of why this judge thought 40 years made sense. What I didn't see was an acknowledgment of the extent of the variance and any discussion of that. So, is it your position that Ball said you have to, that this court must consider the extent of the upward variance, but you think not necessarily out loud? I think it's implicit in the judge's discussion of the reasons for its upward variance that it considered the extent of its variance. That is, that I don't think. You can't even frame it that way, right? And I will say I found this very tricky because it never says, look, it does talk about, it refers quickly to this is the guideline range, and then something like seven pages later it says, now here's my sentence. But it never connects the two. There's never any moment where the court says explicitly, I get that my sentence is a very high departure or a very big variance. In fact, it's 15 years. There's nothing like that. It doesn't draw that connection. I agree. It sort of explains the 40, but it doesn't explain the variance specifically. And you think that's okay? There doesn't need to be a separate explanation of the variance? I don't think there needs to be a segmented pronouncement of sentence where the court goes through its 3553A analysis and then goes through some kind of separate and apart discussion of the extent of its variance. I think that a court can adequately address the extent of its variance as it did here in the context of its overall discussion of the 3553A factors. You can't directly have a point on this, do we, one way or the other? No. No, Your Honor. Okay. All right. Thank you, Your Honor. Mr. Haynes? Two quick points, if I may. First, on the question that you raised, I believe Judge Coggins. What we believe is that Jones is a bright-line rule, and actually this is the easy rule for courts to apply, which is to ask about the prejudicial publicity. And it is in this circumstance where it's something highly prejudicial that would be very prejudicial information if it got to the jury, plainly inadmissible, plainly something that a jury shouldn't consider. And that's why the authorities say, in this situation, the collective question is okay if you're asking about the prejudicial publicity. If you're making sure that in the collective environment, the jury would understand what it is that you need to be concerned about. And that's why the bright-line rule here is simple, and it's what we did ask the judge to do. We brought the article to his attention, and we asked specifically that he ask about whether their household subscribed to the Richmond Times-Dispatch. So our position is that that's, you know, the question that the government asked, well, why wouldn't what it asked encompass reading the headline to the Richmond Times-Dispatch? It's the same reason that the general question that the Tenth Circuit said was insufficient in Thompson, just generally asking the jury, did anything happen over the weekend that affected your view of the case? They said that's not enough either. A general question about prejudice is not enough. Beating around the bush in this kind of situation is not sufficient, but the bright line, easy to apply to us from Jones, is easy to apply. And that's what the court should have done in this case. And as you pointed out, Judge Harris, that also protects the jury against accidentally being exposed to the headline later on. The second point I want to make just about the sentence in Gall, Judge Harris, I agree. We looked far and wide for some clearer guidance on this. But our position is it's, again, built into the structure of Gall itself. Gall walks you through those three key things that a trial judge should do in this situation. Take the initial benchmark, the guideline, and then that a major departure, the extent, they need to consider the extent of the departure. And the reason for that is because they should recognize and address the fact that a major departure requires major justifications more than a minor departure. And, again, it's that basic structure of Gall that we think is what required the judge to go beyond what he said in just arriving at a 40-year sentence. Thank you. Mr. Haynes, I noticed that you and your associate were court-appointed, and when you say that, we appreciate your service. We couldn't do our job without having you help us out. Thank you. Glad to do it. All right, we will stand in recess until the ball is in the lane. I'm ready to come down and hear you now. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Henry F. Floyd, Pamela A. Harris, Donald C. Coggins Jr.